[Criminal No. 722.   Filed June 8, 1931.]

[299 Pac. 1029.]

T. H. KENDALL, Appellant, v. STATE, Respondent.

Mr. W. L. Barnum and Mr. Robert McMurchie, for Appellant.

Mr. K. Berry Peterson, Attorney General, Mr. Riney B. Salmon, Assistant Attorney General, and Mr. Lloyd J. Andrews, County Attorney, for the State.

ROSS, J.—By information, the appellant Kendall was accused of the embezzlement, on or about September 14, 1927, of the sum of $1,834.53, the money and property of the Arizona Pimacotton Growers' Association, he being at the time the agent and servant of such association and as such in possession of its

said money. He was tried in June, 1929, and from a verdict and judgment of conviction has appealed.

At the close of the state's case and at the close of the whole case, the appellant made a motion for an instructed verdict on the ground of variance between the allegations of ownership and the proof, it being contended the evidence showed the property alleged to have been embezzled belonged to the Arizona Cotton Processing Company and not to the Arizona Pimacotton Growers' Association. The court's refusal to grant these motions is made the basis of three assignments of error.

The admission of evidence showing, or tending to show, appellant had committed, while such agent and servant of the association, other like acts is made the basis of another assignment.

The Pimacotton Growers' Association, to which we shall refer as the association, was organized under chapter 156, Laws of 1921, as a nonprofit co-operative marketing association. Its membership under the law consisted of producers of cotton and its powers were limited to the handling and marketing of such members' cotton products. Experience had demonstrated to the association that on occasion the demands of the market could not be complied with from the cotton stocks of its members, and that to meet such demand it was necessary to go among nonmember producers of cotton and buy up their products to mix with or supplement those of the association. To do this the association fell upon the idea of using the Arizona Cotton Processing Company, a corporation, to which we shall refer as the processing company, with interlocking officers and boards of directors. The capital of the processing company was furnished out of the association's surplus and accumulations.

The processing company, instead of joining the association and going out and buying cotton in its

own name to meet the needs of the market as above stated, through its and the association's officers authorized appellant Kendall to purchase the cotton as needed in his name but for the processing company's account. Just why the processing company did not join the association and sign the regulation contract that each member was required by law to sign was, as we understand the record, perhaps, for two reasons: It did not wish to incur the duties and obligations of a member, nor the ill will of local cotton brokers by openly entering the brokerage field in competition with them. At all events, it did not join the association and was not under the law entitled to have its cotton handled or marketed by the association. Appellant was a member of the association. Accordingly, it was arranged that he should buy cotton for the processing company and turn it in to the association as demanded or required, the account with the association to appear in the name of "T. H. Kendall, Special." After such arrangement appellant bought cotton for the processing company and paid for it with the latter's funds. He, as the general manager of the association, accepted such cotton for the association and with the latter's funds paid for it.

On March 19, 1927, the books of the association showed a balance due from the association to "T. H. Kendall, Special," of $1,834.53, and on that day appellant, in making final distribution to the members of the association, issued the check to himself for that amount. Appellant kept the check until September 14, 1927, on which day he presented it to the bank and received payment thereof. Claiming certain portions thereof as a refund to him for expenses and the balance as a final distribution to him on his personal account as a member of the association, appellant refused and failed to pay this sum over to the processing company or otherwise to account for it.

The evidence is all to the effect that Kendall was the secretary and general manager of the association and general manager of the processing company and as such had general charge of their business and the right to draw and indorse checks for and on account of either or both. The appellant, then, under the evidence had authority, as general manager and secretary of the association, to issue its check to himself to pay the association's debt to the processing company and, as the manager of the processing company, authority to accept said check and upon its payment credit the association therewith. He sustained a trust relation to both corporations. He was the "agent" and "servant" of both, in the sense in which those words are used in the embezzlement statute (section 501, Penal Code 1913). In this particular transaction he represented the association as the payer of a debt and the processing company as the collector of such debt. In this dual capacity he drew the association's check for said sum, that being the amount owing the processing company, but there was no physical or manual change of possession. In the transaction he was figuratively both the creditor and the debtor. He came into possession of the check for a definite use and purpose, to wit, the payment of the association's obligation to himself as the *alter ego* of the processing company, and the moment he converted the check into money the law automatically applied it to the satisfaction of the processing company's account against the association. The association entrusted appellant with no money but with a check. The check was simply authority to the bank upon which it was drawn to pay the drawee. It did not of itself operate as an assignment of any part of the funds to the credit of the association with the bank. *State* v. *Probert,* 19 N. M. 13, 140 Pac. 1108; paragraph 4334, Civil Code of Arizona 1913.

Where the same person is the representative of both the creditor and the debtor, the very instant that he as the debtor pays to himself the amount owing necessarily by operation of law he accepts such sum for the creditor and there is an acquittance of the debt. Such, as we conceive it, is the situation here. The rule governing in such circumstances is as follows: "Payment to an agent who is either expressly or impliedly authorized to receive the same is in effect payment to the principal, and, at least to the extent of such payment, is a satisfaction of the debt, and to that extent will discharge the payer, or entitle him to credit on his debt, regardless of what disposition the agent makes of the sum paid. . . . " 2 Corpus Juris 635, § 279. If these two corporations had been represented by different agents in this transaction, there could be no question whatever but that the money received for the check was that of the processing company. The fact that appellant was the agent of both corporations in this transaction cannot change the legal situation.

That the two corporations were separate entities, organized for entirely different purposes, is made to appear from the testimony of Fred J. Elliott, vice-president of the association. The articles of incorporation of the processing company are not in the record, or if so we have not found them, and we must accept the statement of witness as to the purpose for which such company was organized. Such statement is not full, but we gather therefrom that some of the officers of the association, and perhaps all of them, felt that they should have some kind of a separate organization engaged in the cotton-seed oil and ginning business. The processing company was therefore organized and $60,000 was advanced to it by the association, with which and the processing company's note or notes the latter bought $210,000 worth of the

stock of the Mutual Cotton & Oil Company, a concern engaged, as we gather, in the cotton-seed oil and ginning business. Under its charter (see chapter 156, *supra*) the association probably had a right to invest its funds in the stocks of the Mutual Cotton & Oil Company and to make its purchases, and thereafter hold them, through the processing company. If the evidence showed that the processing company was a holding company for the association, that all its business transactions were carried on as the agent of the association, and all its holdings, including profits and dividends, were the property of the association, it might well be contended that the proof and allegations as to ownership of the money were the same. However, the evidence is clear that the two corporations dealt with each other at arm's length in their cotton sales. The association treated the processing company just as it treated its members. It kept an account with it in the same way it kept accounts with its members, and at regular intervals sent it checks to balance the account, just as it sent checks to its members. Although the processing company was not a member of the association, it was given the privileges of a member. So far as the record discloses, the earnings and profits paid the processing company were as much the property of that company as were the earnings and profits of regular members for cotton marketed for them by the association.

The suggestion that the processing company was a subsidiary of the association and any misappropriation of the processing company's funds would be a misappropriation of the funds of the association is not true either in fact or law.

Since it appears that the money appellant is alleged to have embezzled was the money of the processing company and not that of the association, it becomes

unnecessary to pass upon the assignment raising the question of the competency of the evidence of other acts and transactions similar to the one charged.

The law seems to be very well settled that the allegations of the information as to ownership of the property embezzled are material and must be established by the evidence substantially as alleged. If the evidence discloses, as here, that the property belongs to some one other than the one alleged to be its owner, there is a fatal variance. 20 Corpus Juris, 480, § 75.

It is too bad the error in pleading occurred. It is always more satisfactory to dispose of criminal cases on the issue of guilty or not guilty. As it is, both the state and the defense have been put to the trouble and expense of a long and tedious trial and neither stands vindicated. Vindication is possible only through another long and tedious trial on an information alleging the ownership of the property in the processing company.

The motion for a directed verdict on the ground of variance should have been granted.

The judgment is reversed and the case remanded, with the direction that the information be dismissed on the ground of variance between its allegations and the proof.

McALISTER, C. J., concurs.

LOCKWOOD, J., Specially Concurring.—I concur in the result reached by the majority of the court. The evidence is clear that the processing company and the association were legally two separate and distinct entities, dealing with each other at arm's length so far as formal and external conduct of their business was concerned, and that the legal title to the money in question was in the processing company.

The evidence, however, in regard to their actual relations is of such a nature that I think it at least open to question whether in a civil action it might not be determined that the net assets and profits of the processing company were held by it in trust for the association.